**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MONDAY RESTAURANTS LLC, on behalf of ) <br> itself and all others similarly situated, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> DEFENDANT INTREPID INSURANCE ) <br> COMPANY, ) <br> d/b/a INTREPID DIRECT INSURANCE, ) <br> an Iowa Corporation ) <br> ) <br> and ) <br> ) <br> W.R. BERKLEY CORPORATION, ) <br> a Delaware Corporation ) <br> ) <br> ) <br>     Defendants. ) | Case No.: <br><br> JURY TRIAL DEMANDED |

**<u>PLAINTIFF'S CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

I.   NATURE OF THE ACTION ................................................................................ 1

II.  THE PARTIES ................................................................................................... 4

III. JURISDICTION AND VENUE ......................................................................... 5

IV.  FACTUAL ALLEGATIONS ............................................................................. 5

    A.     The Global COVID-19 Pandemic ............................................................ 5

    B.     Steps Taken by Authorities to Control the Pandemic, Including Restricting Dining in
         Restaurants ............................................................................................. 8

    C.     The Damaging Impact of the COVID-19 Pandemic on Restaurants .......................... 12

    D.     The Damaging Impact of the Pandemic on Plaintiff's Business ................................ 15

    E.     Plaintiff's Business Insurance Policies with Defendants ............................................ 15

    F.     Defendants' Efforts to Discourage Insureds from Making Claims Despite Knowing
         That It Will Have to Pay Them ................................................................................ 19

V.   CLASS ALLEGATIONS ................................................................................... 24

VI.  JURY DEMAND .............................................................................................. 27

    Count I: Business Income Breach of Contract ............................................... 27

    Count II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to
    Business Income ........................................................................................... 28

    Count III: Declaratory Relief .......................................................................... 30

    Count IV: Extra Expense Breach of Contract ................................................ 31

    Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing ....................... 32

    Count VI: Declaratory Relief .......................................................................... 33

    Count VII: Business Income Breach of Contract ........................................... 35

    Count VIII: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to
    Business Income ........................................................................................... 36

    Count IX: Declaratory Relief .......................................................................... 37

    Count X: Extra Expense Breach of Contract ................................................. 39

Count XI: Breach of the Implied Covenant of Good Faith and Fair Dealing ...................... 40

Count XII: Declaratory Relief ............................................................................ 41

VII. PRAYER FOR RELIEF ........................................................................... 42

PLAINTIFF MONDAY RESTAURANTS LLC ("Plaintiff"), individually and on behalf of other similarly situated persons and entities operating restaurants in Missouri, makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff, which are based on personal knowledge. Plaintiff brings this action for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory and injunctive relief against INTREPID INSURANCE COMPANY, d/b/a Intrepid Direct Insurance ("Defendant Intrepid" or "Intrepid"), and W.R. BERKLEY CORPORATION ("Defendant W.R. Berkley") (collectively "Defendants"), demanding a trial by jury.

## I. NATURE OF THE ACTION

1. Plaintiff owns two franchised Jimmy John's restaurants in the St. Louis area. To make sure that it would be protected if it was forced to temporarily cease some or all of its operations by unanticipated events beyond its control, it purchased a commercial insurance policy from Defendants covering the period of March 19, 2019-March 19, 2020, and another policy for the period of March 19, 2020-March 19, 2021. Those policies are attached hereto as Exhibits A and B, respectively.

2. Defendant Intrepid is a company that specializes in insuring franchised restaurants. On its website, it claims that its offerings "not only meet requirements, but best protect a franchise restaurant":[1]

## Our offering
—

We took our knowledge of the restaurant industry, listened to franchisees and reviewed franchisor insurance requirements to offer coverages that not only meet requirements, but best protect a franchise restaurant.

---

[1] https://www.intrepiddirect.com/franchise-restaurant-insurance/ (accessed 5/28/2020).

3.  Aside from Plaintiff, many other restaurants and other businesses in Missouri and the United States have purchased insurance from Defendants to protect against losses from unexpected catastrophic events. These policies promise to indemnify the policyholder for actual business losses incurred when business operations are involuntarily suspended, interrupted, or curtailed because of direct physical loss of or damage to the property. This coverage, commonly known as "business interruption" or "business income" coverage, is standard in most all-risk commercial property insurance policies.

4.  The very type of unanticipated event for which Plaintiff and other restaurants needed protection and for which Defendants claimed to offer the "best protect[ion]"[2] occurred in early 2020. That event, the worst health crisis to hit the State of Missouri, the United States, and indeed the world in over a century, was a worldwide pandemic of a disease called COVID-19. It caused a massive number of illnesses and an extraordinarily high number of deaths.

5.  As a result of the pandemic and to protect against its spread, on March 16, 2020, the White House advised all Americans to "[a]void eating or drinking in bars, restaurants, and food courts."[3]

6.  The next day, Governor Mike Parson issued the same advice for Missourians.[4]

7.  A few weeks later, on April 3, the state of Missouri made that advice mandatory for Missourians in a "Stay at Home" Order, a restriction that remained in effect from April 6, 2020, through May 3, 2020.[5] At the end of that period, dining was allowed in Missouri restaurants, but only so long as "proper spacing of at least six feet (6') between tables, lack of communal seating

---

[2] *Id.*
[3] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed 5/19/2020).
[4] https://khqa.com/news/state/missouri-gov-gives-briefing-encourages-guidelines (accessed 5/19/2020).
[5] https://governor.mo.gov/priorities/stay-home-order (accessed 5/19/2020).

areas to parties that are not connected, and having no more than ten (10) people at a single table, are properly adhered to."[6]

8. These advisories and restrictions – and indeed, the pandemic itself – have had a devastating effect on the restaurant industry, both in Missouri and throughout the country.

9. However, despite the provision of business income coverage in its policies, Defendants are publicly refusing to comply with their obligation to pay for business income losses and covered expenses incurred by policyholders as a result of the physical loss of and damage to their insured property arising from the COVID-19 pandemic.

10. Defendant W.R. Berkley's CEO, none other than Mr. W.R. Berkley himself, claimed in an earnings call with financial analysts that the company's policies did not cover business losses due to the pandemic; he even accused lawyers for insureds of trying to take advantage of the catastrophe. He stated that they "seem to subscribe to the unfortunate idea of never letting a crisis go to waste." [7]

11. Restaurant losses due to the pandemic are not imagined. Plaintiff therefore brings this action on behalf of itself and classes and subclasses of restaurant operators (as defined below) that (a) purchased standard commercial property insurance policies from Defendants that provide for business income loss and extra expense coverage and do not exclude coverage for pandemics and (b) have suffered business income and extra expense losses.

12. This action also seeks a declaratory judgment that Defendants are contractually obligated to pay these losses. In addition, Plaintiff seeks damages, attorneys' fees and costs, and any other

---

[6] https://governor.mo.gov/sites/gov/files/media/pdf/2020/04/Economic-Reopening-Phase-1.pdf (accessed 5/19/2020).
[7] [7] Edited Transcript of Q1 2020 W.R. Berkley Corp. Earnings Call, April 21, 2020, available on Defendant Berkley's website at https://ir.berkley.com/home/default.aspx (accessed 5/29/2020) (emphasis added).

relief that this Court deems equitable and just, arising out of Defendants' breach of contract and wrongful conduct alleged herein.

## II.  THE PARTIES

13. Monday Restaurants, LLC, is a Missouri Limited Liability Company with its principal place of business in O'Fallon, MO. It operates two Jimmy John's franchised restaurants in St. Charles County, Missouri, one in O'Fallon and one in Saint Charles.

14. Defendant Intrepid is an insurance company, regulated by the Division of Insurance, incorporated in Iowa, with its home office at 11201 Douglas Ave., Urbandale, IA 50322. It also has a place of business at 7400 College Blvd., Suite 350, Overland Park KS 66210. Its registered agent in Iowa is Taaron Pearce, 11201 Douglas Ave., Urbandale, IA 50322.

15. Defendant Intrepid is a member company of the W.R. Berkley group of companies. The terms and conditions of Defendant Intrepid's website states that the "website is owned and maintained by Intrepid Direct Insurance Agency, LLC ('Intrepid', 'we', 'us', or 'our'), of the W. R. Berkley Corporation member companies (collectively, the 'Company')." Those terms and conditions state: "You acknowledge that the information you may enter into any on-line application is material to any decision by the underwriting *company* to issue a policy ...."[8]

16. Defendant W.R. Berkley "is an insurance holding company that is among the largest commercial lines writers in the United States and operates worldwide in two segments of the property casualty insurance business: Insurance and Reinsurance & Monoline Excess."[9] It is incorporated in Delaware and has its principal place of business at 475 Steamboat Road, Greenwich, CT, 06830.[10]

---

[8] https://www.intrepiddirect.com/terms-of-use/ (accessed 5/26/2020) (emphasis added).
[9] https://s22.q4cdn.com/912518152/files/doc_news/W-R-Berkley-Corporation-Announces-Pricing-of-300-Million-of-400-Senior-Notes-Due-2050-2020.pdf (accessed 5/19/2020)
[10] W.R. Berkley Corporation SEC Form 10-K for year ended 12/31/2019.

17. Defendant W.R. Berkley states on its website: "We provide insurance solutions through more than 50 Berkley companies - each with deep expertise in an industry, product line, or geographic niche."[11] One of those companies is Defendant Intrepid.

### III. JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2) because there is complete diversity between Defendants and at least one member of the class; there are more than one hundred members of the class; and the amount in controversy in the claims of the Class exceeds $5,000,000.00, exclusive of interest and costs. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2202 and is authorized to grant declaratory relief under these statutes.

19. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part, if not all, of the acts and omissions complained of in this action took place in this district.

### IV. FACTUAL ALLEGATIONS

**A. The Global COVID-19 Pandemic**

20. According to the World Health Organization ("WHO"), COVID-19 is an infectious disease for which there are no vaccines or treatments.[12] It spreads easily from person-to-person.[13]

21. When an infected person coughs, sneezes, or even just talks, droplets with the infectious agent fly into the air from the person's nose or mouth and can thereby infect others. This can occur even if the person is asymptomatic.[14] As WebMD states, "Some people who don't know

---

[11] https://www.berkley.com/ (accessed 5/28/2020).
[12] https://www.who.int/health-topics/coronavirus#tab=tab_1 (accessed 5/10/2020).
[13] https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/summary.html#:~:text=On%20March%2011%2C%20the,of%20new%20influenza%20viruses. (accessed 5/10/2020).
[14] https://www.webmd.com/lung/coronavirus-transmission-overview#1 (accessed 5/10/2020).

they've been infected can give it to others. This is called asymptomatic spread. You can also pass it on before you notice any signs of infection, called presymptomatic spread."[15]

22.  Thus, there is no way to know whether a person with whom one comes into contact might be spreading the disease.

23. The coronavirus can live in the air for up to three hours, be breathed in by others, and get into their lungs, where it can infect them.[16]

24. The coronavirus can also infect people who touch surfaces, such as countertops, furniture, doorknobs and other surfaces in a restaurant that contain the virus. It can live on plastic and stainless steel for up to three days.[17]

25. According to the Centers for Disease Control, COVID-19 can cause mild to severe symptoms, such as cough, shortness of breath or difficulty breathing, fever, chills, muscle pain, sore throat and loss of taste or smell.[18]

26. COVID-19 is a new disease. The first known outbreak was a cluster of cases of pneumonia in Wuhan, Hubei Province in China in December 2019.[19] The disease did not even have an official name when WHO declared a "Public Health Emergency of International Concern" on January 30, 2020.[20] The disease was given its name by WHO on February 11, 2020, short for "coronavirus disease 2019." [21]

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (accessed 5/22/2020).
[19] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[20] https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen (accessed 5/10/2020).
[21] https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200211-sitrep-22-ncov.pdf?sfvrsn=fb6d49b1_2 (accessed 5/10/2020).

27. After it was discovered, COVID-19 spread rapidly. On March 11, 2020, "[d]eeply concerned both by the alarming levels of spread and severity, and by the alarming levels of inaction, WHO made the assessment that COVID-19 can be characterized as a pandemic."[22]

28. A pandemic is "an outbreak of a disease that occurs over a wide geographic area and affects an exceptionally high proportion of the population."[23] To be classified as a pandemic, WHO requires "the worldwide spread of a new disease."[24]

29. At the point that WHO called COVID-19 a pandemic on March 11, the number of cases outside China in just the past two weeks had increased by 13-fold to 118,000 in 114 countries; more than 4,000 people had lost their lives, and as the Director-General of WHO stated, "[t]housands more [were] fighting for their lives in hospitals."[25]

30. According to the COVID Tracking Project, by that same date, March 11, 1,813 patients had tested positive in the United States, and 43 patients had died. From that date on, the number of cases and deaths increased exponentially. By March 17, 2020, less than a week later, when Governor Parson advised Missourians not to eat in restaurants, the number of cases nationwide had increased approximately 5 times to 8,863, and the number of deaths had increased by approximately three times to 120.[26]

31. By the time Missouri issued its "Stay at Home" Order on April 3, 2020, positive tests nationwide had increased *another 31 times* to 276,047 and deaths another *59 times* to 7,112.[27]

---

[22] https://www.who.int/news-room/detail/27-04-2020-who-timeline---covid-19 (accessed 5/10/2020).
[23] https://www.merriam-webster.com/dictionary/pandemic (accessed 5/11/2020) (accessed 5/10/2020).
[24] https://www.who.int/csr/disease/swineflu/frequently_asked_questions/pandemic/en/ (accessed 5/10/2020).
[25] https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (accessed 5/10/2020).
[26] https://covidtracking.com/data/us-daily (accessed 5/21/2020).
[27] https://covidtracking.com/data/state/missouri#historical (accessed 5/21/2020)

32. As of June 12, 2020, according to the *New York Times*, 2 million Americans had tested positive, and 114,000 had died.[28] That was more than any other country in the world and the 10th and 12th highest on a per capita basis, respectively.[29]

33. Missouri was hit by COVID-19 later than other states, but once it arrived it spread rapidly. As of March 11, 2020, when COVID-19 was first declared a worldwide pandemic, there was only one reported case in Missouri and no deaths. By March 17, there had been eight positive tests and still no deaths. But by April 3, when Gov. Parson issued his "Stay at Home" Order, positive tests had skyrocketed to 2,113 and 19 Missourians had died of the disease. As of June 12, there had been 15,9240 cases, and 873 COVID-19 deaths in Missouri.[30]

**B.  Steps Taken by Authorities to Control the Pandemic, Including Restricting Dining in Restaurants**

34. On March 13, 2020, the White House issued a proclamation declaring "that the COVID-19 outbreak in the United States constitutes a national emergency"; it specified that the emergency had actually begun March 1, 2020.[31]

35. Also on March 13, Governor Mike Parson signed an executive order declaring a state of emergency in Missouri due to COVID-19.[32]

36. On March 13, 2020, a state of emergency presented by COVID-19 was declared in St. Charles County, where Plaintiff's restaurants are located, as well as St. Louis City, St. Louis County and other counties in Missouri.[33]

---

[28] https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (accessed 6/11/2020).
[29] *Id.*
[30] https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html (accessed 6/11/2020)..
[31] https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (accessed 5/21/2020).
[32] https://governor.mo.gov/press-releases/archive/governor-parson-signs-executive-order-20-02-declaring-state-emergency (accessed 5/19/2020).
[33] https://www.sccmo.org/DocumentCenter/View/15338/State-of-Emergency-COVID-19-PDF; https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/covid-19-public-health-emergency-order-and-proclamation.cfm; https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/; (all accessed 5/21/2020).

37. Three days later, as a result of the pandemic, the White House gave all Americans this blunt advice: "Avoid eating or drinking in bars, restaurants, and food courts."[34]

38. The next day, March 17, 2020, Governor Parson issued the same advice for Missourians.[35]

39. Shortly thereafter, on April 3, 2020, the Missouri Department of Health and Senior Services issued a "Stay at Home" Order,[36] which *mandated* that every person in Missouri avoid eating in restaurants beginning April 6. After an extension, that Order remained in effect through May 3, 2020.[37]

40. Similar orders were put into effect at the County level in Missouri.

41. For example, on March 17, Steve Ehlmann, St. Charles County Executive, issued an order that restaurants, food establishments, food courts, and other places of public accommodation offering food or beverage were not permitted to allow on-premises consumption. If they offered food or beverage service to the public, they were to use delivery, window, walk-up, drive-up or drive-through service. If they allowed members of the public to enter their premises, there were additional restrictions, such as prohibiting more than 10 members of the public in the premises at one time and keeping them at least six feet apart to the extent possible.[38]

42. On March 23, 2020, St. Charles County Executive Ehlmann issued an order that every person in the County must remain in their residence or surrounding property except to engage in

---

[34] https://www.reuters.com/article/health-coronavirus-trump-guidelines-idUKL1N2B95Q1 (accessed 5/19/2020).
[35] https://khqa.com/news/state/missouri-gov-gives-briefing-encourages-guidelines (accessed 5/19/2020).
[36] https://governor.mo.gov/priorities/stay-home-order (accessed 5/19/2010).
[37] https://governor.mo.gov/priorities/stay-home-order (accessed 5/19/2020).
[38] https://www.sccmo.org/DocumentCenter/View/15339/Executive-Order-20-03-Food-and-Beverage-PDF (accessed 5/21/2020).

"(a) activities they deem essential to their physical, mental, and spiritual well-being, or (b) employment …."[39] That ruled out dining in restaurants.

43. Other Missouri counties issued similar orders.

44. For instance, on March 21, 2020, St, Louis County Executive Dr. Sam Page issued an Executive Order commanding the Director of the St. Louis County Department of Public Health to issue an order directing that "people stay home when possible" other than, inter alia, to "perform tasks *essential* to the health and safety of individuals, their families, their household members, and their pets, such as … visiting a health care professional or hospital …."[40]

45. On March 24, 2020, the St. Louis County Director of Public Health issued an Order Restricting the Operations of Restaurants and Bars, which barred members of the public from entering or occupying "[r]estaurants, food establishments, food courts, cafes, coffeehouses, and other Places of Public Accommodation offering food or beverage, where food and beverages are normally consumed on-premise."[41]

46. The City of St. Louis issued a Stay at Home Order that, as in St. Louis County, went into effect March 23. It ordered all individuals living in the City to remain at home with certain exceptions including "[t]o perform tasks essential to the health and safety of individuals, their family [and] household members … such as … visiting a health care professional."[42] That order was extended on April 16, 2020, with no definite ending date.[43] On May 11, 2020, the City

---

[39] https://www.sccmo.org/DocumentCenter/View/15365/20-06-Executive-Order-PDF (accessed 5/21/2020).
[40] https://stlcorona.com/dr-pages-messages/exec-orders/county-executive-order-15-restrictions-on-activities-to-limit-spread-of-covid-19/ (accessed 5/21/2020) (emphasis added).
[41] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-order-restricting-the-operations-of-restaurants-and-bars/ (accessed 5/21/2020).
[42] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commission-s-Order-5-03-21-2020.pdf (accessed 5/11/2020).
[43] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Health-Commissioner-s-Order-No-7.pdf (accessed 5/11/2020).

Health Commissioner entered an order similar to that in St. Louis County, allowing limited re-opening as of May 18.[44]

47. Similar directives were promulgated throughout Missouri and, indeed, the entire country.

48. These restrictions began to be eased somewhat in May, but limitations remained in place.

49. Beginning May 4, 2020, dining was allowed in restaurants in Missouri, so long as "proper spacing of at least six feet (6') between tables, lack of communal seating areas to parties that are not connected, and having no more than ten (10) people at a single table, are properly adhered to."[45]

50. Some counties were more restrictive. St. Louis City[46] and County[47] did not allow dining in restaurants until May 18, 2020, and even then only with restrictions such as social distancing (maintaining a distance of 6 feet between and among employees and guests). Moreover, the St. Louis County Director of Health noted: "*All Gatherings* pose an increased risk of transmission and should be voluntarily avoided whenever possible." [48]

51. As of June 12, 2020, St. Charles County was still recommending that residents not attend restaurants. On that date its website stated: "As much as possible, stay home unless performing an essential function (i.e. going to work, grocery shopping, picking up prescriptions at a pharmacy)."[49] Eating in a restaurant was not listed as an essential function

---

[44] https://www.stlouis-mo.gov/government/departments/mayor/news/city-of-st-louis-to-begin-gradually-reopening-on-may-18.cfm (accessed 5/13/2020).

[45] https://governor.mo.gov/sites/gov/files/media/pdf/2020/04/Economic-Reopening-Phase-1.pdf (accessed 5/21/2020).

[46] https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/FINAL-ORDER-NO-8.pdf; https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/FINAL-Phase-I-Reopening-Standards-and-Guidance.pdf; https://www.stlouis-mo.gov/government/departments/health/communicable-disease/covid-19/documents/upload/Phase-1-Reopening-Exhibit-F.pdf (all accessed 5/21/20200.

[47] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 5/21/2020).

[48] https://stlcorona.com/dr-pages-messages/public-health-orders/director-of-public-health-business-and-individual-guidelines-for-social-distancing-and-re-opening/ (accessed 5/21/2020) (emphasis added).

[49] https://www.sccmo.org/2123/COVID-19-Guidelines-for-Residents (accessed (6/12/2020).

### C.  The Damaging Impact of the COVID-19 Pandemic on Restaurants

52. The COVID-19 pandemic, along with the recommendations and restrictions described above, have had a devastating impact on restaurants in Missouri and elsewhere.

53. The National Restaurant Association states: "COVID-19 closures have devastated the restaurant industry and left closures and layoffs in its wake."[50]

54. In the spring of 2020, "[a]djusting for inflation, consumer spending at eating and drinking places plunged to its lowest level since October 1984."[51]

55. The decline in restaurant business actually began before the federal government advised against eating in restaurants on March 16. OpenTable found that reservations at restaurants in the United States fell steadily in late February and early March "before falling off a cliff" and declining by 36% on Friday, March 13.[52]

56. Similarly, data reported by the customer management software company Womply, which compiles transaction data for restaurants and other businesses, shows that, on a day-to-day basis restaurant sales compared to the same date a year earlier were declining as February turned to March. By March 10 they had declined by 13%, by March 13 by 32% and by March 22 by a devastating 81%.[53]

57. The National Restaurant Association presents a graph that vividly shows the lost business experienced by restaurants due to the COVID-19 pandemic.[54]

---

[50] https://restaurant.org/Manage-My-Restaurant/Business-Operations/Covid19/Advocacy-for-the-Industry (accessed 5/21/2020).
[51] https://restaurant.org/Articles/News/Restaurant-sales-fell-to-lowest-level-in-35-years (accessed 5/21/2020).
[52] https://www.restaurantbusinessonline.com/financing/open-table-data-shows-just-how-bad-traffic-falling (accessed May 29, 2020).
[53] https://www.womply.com/blog/data-dashboard-how-coronavirus-covid-19-is-impacting-local-business-revenue-across-the-u-s/ (accessed 5/29/2020).
[54] https://restaurant.org/Articles/News/Restaurant-sales-fell-to-lowest-level-in-35-years (accessed 5/21/2020).



58. Conditions continued to be bleak after April. The following graph from Womply's website shows vividly the overall decline beginning in March indicates that revenue had declined by more than 70% in much of April: [55]



*This chart examines total revenue at restaurants in our analysis in 2020 compared to total revenue at restaurants on a similar day in 2019.*

59. The same trend occurred in Missouri. According to a dataset linked on Opentable's website[56], Missouri restaurant sales were declining for more than a week before the federal

---

[55] https://www.womply.com/blog/data-dashboard-how-coronavirus-covid-19-is-impacting-local-business-revenue-across-the-u-s/ (accessed 5/29/2020).
[56] https://www.opentable.com/state-of-industry (accessed 5/21/2020).

government advised against eating in restaurants on March 16. The following table shows the trend:

| Date | Change from year earlier |
|------|--------------------------|
| March 8 | -10% |
| March 9 | -13% |
| March 10 | -10% |
| March 11 | -12% |
| March 12 | -25% |
| March 13 | -29% |
| March 14 | -42% |
| March 15 | -45% |

60. But after that, once governments advised against eating in restaurants, restaurant sales in Missouri went to rock bottom. They were down 65% on March 16, 88% on March 17, 90% on March 18, 97% on March 19, and from then on down 99 or 100% every day through May 6.[57]

61. As the country began to open up in May, restaurant sales were still well below year-ago levels; Womply data shows that on May 24, they were down 63% in the country as a whole.[58] The above graph shows that total restaurant revenue was still down more than 50% in June.

62. In Missouri, the restaurant business continued its grim path even after the State allowed in-restaurant dining on May 4. OpenTable's data based on online reservations, phone reservations and walk-ins of restaurants in its database shows that the restaurant business in Missouri was down by 97% every day through May 14; by May 21 it was still down 82%, was down more than 75% every day from May 22 through June 3 and still hadn't improved to better than a 62% decline even as late as June 11, the most recent data as of the filing of this case.[59]

---

[57] *Id.*
[58] https://www.womply.com/blog/data-dashboard-how-coronavirus-covid-19-is-impacting-local-business-revenue-across-the-u-s/ (accessed 5/29/2020).
[59] *See* dataset linked to https://www.opentable.com/state-of-industry (accessed 5/21/2020).

### D. The Damaging Impact of the Pandemic on Plaintiff's Business

63. Like the rest of the industry, Plaintiff was hard-hit by the pandemic. Its restaurants stopped in-person dining and began closing early on or about March 10, 2020. From then on until May 18, its business was limited to curbside pick-up at its O'Fallon restaurant and a drive-thru window in the case of its St. Charles location, along with delivery at both locations. As a result, Plaintiff suffered a dramatic sales decline compared to pre-pandemic levels.

64. Moreover, even before it closed its dining rooms, Plaintiff's business suffered as customers were unwilling to patronize restaurants because of the pandemic.

65. Plaintiff's business continued to suffer even after it re-opened its dining room. That was largely due to the necessity of maintaining social distancing among its customers and staff.

66. The pandemic has also caused Plaintiff to incur extra expenses for items such as protective masks and gloves for its employees.

67. The result of all these factors has been a dramatic loss of sales and profits in an amount to be determined.

### E. Plaintiff's Business Insurance Policies with Defendants

68. In exchange for premiums paid by Plaintiff to Defendants, Plaintiff obtained a Commercial Lines Policy, Policy No.: iRP 1501187 -1, covering a Policy Period from 3/19/2019 to 3/19/2020 (Exhibit A; "the 2019 Policy"), followed by a Commercial Lines Policy, Policy No.: iRP 1501187 - 2, covering a Policy Period from 3/19/2020 to 3/19/2021 (Exhibit B) ("the 2020 Policy").

69. These policies are substantively identical.

70. The Commercial Property Declarations of these Policies state that they provide coverage to the limit of "Actual Loss Sustained" with respect to Business Income Including Rental Value and Extra Expense at both locations; the Covered Causes of Loss for Business Income are

indicated as "SPECIAL." Ex. A at 30; Ex. B at 33 (page numbers refer to the page of the pdf file).

71. The Location Schedule includes both of Plaintiff's restaurants, Location # 1 at 981 Waterbury Falls Dr., O'Fallon, MO 13368-2215, and Location #2 at 100 N. Kingshighway St., Saint Charles, MO 63301-1635. Ex. A at 12; Ex. B at 12. These are the premises described in the Commercial Property Declarations.

72. Under the Policies, Business Income is defined as the:

    a. Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred; and

    b. Continuing normal operating expenses incurred, including payroll.

Ex. A at 49; Ex. B at 52.

73. The Business Income provision provides coverage for lost Business Income:

> We will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration'. The 'suspension' must be caused by direct physical loss of or damage to property at premises which are described in the Declarations and for which a Business Income Limit Of Insurance is shown in the Declarations. The loss or damage must be caused by or result from a Covered Cause of Loss.

Ex. A at 49; Ex. B at 52.

74. The Policies also cover Extended Business Income for losses that occur after the property is restored, as follows:

> If the necessary "suspension" of your "operations" produces a Business Income loss payable under this policy, we will pay for the actual loss of Business Income you incur during the period that:
>
> (a) Begins on the date property (except "finished stock') is actually repaired, rebuilt or replaced and 'operations' are resumed; and
>
> (b) Ends on the earlier of:

16

> (i) The date you could restore your "operations", with reasonable speed, to the level which would generate the business income amount that would have existed if no direct physical loss or damage had occurred; or
>
> (ii) 60 consecutive days after the date determined in (1)(a) above. However, Extended Business Income does not apply to loss of Business Income incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located.
>
> Loss of Business Income must be caused by direct physical loss or damage at the described premises caused by or resulting from any Covered Cause of Loss.

Ex. A at 51; Ex. B at 54.

75. "Suspension" means "[t]he slowdown or cessation of your business activities …." Ex. A at 57; Ex. B at 60. That applies to Plaintiff's Business Income losses because, as a result of the COVID-19 pandemic, its business activities slowed down or ceased.

76. "Operations" means "[y]our business activities occurring at the described premises …." Ex. A at 57; Ex. B at 60. That applies to Plaintiff's operations of its restaurant business.

77. For business income coverage, "period of restoration" starts "72 hours after the time of direct physical loss or damage …." Ex. A at 57; Ex. B at 60.

78. The 2020 Policy also covers Extra Expense, which is defined as "necessary expenses you incur during the 'period of restoration' that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." Ex. A at 49; Ex. B at 52.

79. For Extra Expense Coverage, "period of restoration" means the period that begins "[i]mmediately after the time of direct physical loss or damage … caused by or resulting from any Covered Cause of Loss at the described premises." Ex. A at 57; Ex. B at 60 (paragraphing omitted).

17

80. The COVID-19 pandemic caused a direct physical loss of property at Plaintiff's premises at the Scheduled Locations by denying Plaintiff the ability to physically access and use the property in the normal fashion in its business and/or denying customers the ability to physically access and use the property for dining. It is therefore a covered loss.

81. COVID-19 is a "covered cause of loss" under the policy. Covered Causes of Loss are defined as follows: "When Special is shown in the Declarations, Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." Ex. A at 63; Ex. B at 66.

82. None of the Exclusions, limitations or limits apply to Plaintiff's loss. *See* Ex. A at 63-69, 73. Ex. B at 66-72, 76. There is no exclusion or limitation for losses caused by a pandemic.

83. The Policies contain an endorsement that excludes loss due a virus. That provision states: "We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease." Ex. A at 61; Ex. B at 64. That exclusion does not apply to Plaintiff's loss because that loss was not caused by a virus. There is no evidence that the virus has ever been in his premises. Plaintiff's loss was caused by a pandemic.

84. The Policies set forth the method to determine the Business Income loss. They state:

The amount of Business Income loss will be determined based on:

(1) The Net Income of the business before the direct physical loss or damage occurred;

(2) The likely Net Income of the business if no physical loss or damage had occurred, but not including any Net Income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the Covered Cause of Loss on customers or on other businesses;

(3) The operating expenses, including payroll expenses, necessary to resume "operations" with the same quality of service that existed just before the direct physical loss or damage; and

18

(4) Other relevant sources of information, including:

(a) Your financial records and accounting procedures;

(b) Bills, invoices and other vouchers; and

(c) Deeds, liens or contracts.

Ex. A at 54; Ex. B at 57.

85. The Policies set forth the method of determining recoverable Extra Expense. They state:

a.   The amount of Extra Expense will be determined based on:

(1) All expenses that exceed the normal operating expenses that would have been incurred by "operations" during the "period of restoration" if no direct physical loss or damage had occurred. We will deduct from the total of such expenses:

(a) The salvage value that remains of any property bought for temporary use during the "period of restoration", once "operations" are resumed; and

(b) Any Extra Expense that is paid for by other insurance, except for insurance that is written subject to the same plan, terms, conditions and provisions as this insurance; and

(2) Necessary expenses that reduce the Business Income loss that otherwise would have been incurred.

Ex. A at 54; Ex. B at 57.

86. Plaintiff and Class Members are entitled to coverage under the above provisions of both

Policies in amounts to be determined.

**F.  Defendants' Efforts to Discourage Insureds from Making Claims Despite Knowing That It Will Have to Pay Them**

87. Defendants have taken no steps to cover their insureds for their COVID-related business

losses. To the contrary, they tell insureds and the public that these business losses are not

covered.

19

88. Defendant Intrepid has a web page with its message to insureds regarding COVID-19. That page has a title that states, "REGARDING COVID-19 To Our Insurance Customers."[60] Here is a screenshot of the title of that page:



89. Nowhere on this page does Defendant Intrepid acknowledge to its customers that their COVID-19 losses are covered by their policies. By omitting that acknowledgement, Defendant Intrepid is attempting to convey the message that these losses are not covered.

90. Here is a screenshot of the page's first paragraph[61]:

In these unprecedented and difficult times, the COVID-19 pandemic has impacted businesses, employees, customers and communities. We sincerely appreciate your choosing Intrepid Direct Insurance Agency, LLC, on behalf of Intrepid Insurance Company, Berkley Specialty Insurance Company and StarNet Insurance Company for your business insurance needs and we want to remain connected with you to assist with any issues or concerns you have regarding your business insurance coverage.

91. The first sentence is a recognition that what has impacted businesses, employees, customers and communities is the COVID-19 pandemic, not specifically a virus.

---

[60] https://www.intrepiddirect.com/covid-19/ (accessed 5/22/2020).
[61] https://www.intrepiddirect.com/covid-19/ (accessed 5/22/2020).

92. However, despite Intrepid's assurances that it is aware of the difficulties its insureds are having, appreciates their business, and desires to help them, nowhere in this COVID-19 message does Intrepid even hint that it will pay their lost-business or business-interruption claims.

93. Instead, in the next paragraph, Intrepid states that it has "business continuity plans which are designed to address situations like this," but those plans have nothing to do with paying claims:[62]

> Since the onset of the COVID-19 situation Intrepid Direct Insurance Agency, LLC has implemented its business continuity plans which are designed to address situations like this. As a result, Intrepid Direct Insurance Agency, LLC remains fully operational and ready to serve our customers, while most of our employees are now working remotely for their own safety and protection. This transition has been relatively seamless and we continue to deliver the highest service and support for our customers.

94. Intrepid quickly makes clear that these "business continuity plans designed to address situations like this" and to provide "the highest … support" do not assist the insureds' "business continuity" efforts by paying claims resulting from a "situation like this"; the only "plan" Defendant Intrepid describes for its customers has to do with accommodating those that might have difficulty paying premiums:[63]

> We will be happy to discuss your individual situation and we will endeavor to make reasonable accommodations when required by a specific state insurance department, or if not required, when possible to avoid the cancellation or non-renewal of your current insurance policy.

95. As can be seen, Intrepid states that it will make "reasonable accommodations *when required by a specific state insurance department*, or if not required, *when possible* to avoid the cancellation or non-renewal of your current insurance policy."[64]

---

[62] https://www.intrepiddirect.com/covid-19/ (accessed 5/22/2020) (emphasis added).
[63] https://www.intrepiddirect.com/covid-19/ (accessed 5/22/2020) (emphasis added).
[64] https://www.intrepiddirect.com/covid-19/ (accessed 5/22/2020) (emphasis added)..

96. These "accommodations" regarding paying premiums do not address the real issue presented by a "situation like this."

97. Moreover, in a conference call on April 21, 2020, with seven financial analysts from Credit Suisse AG, Deutsche Bank AG, Goldman Sachs Group Inc., and other firms, W. Robert Berkley, CEO of Defendant Berkley, denied that COVID-19 business losses were covered by the company's policies.[65] He stated: "Many people are looking to the insurance industry for a solution. And unfortunately, they are looking for the solution even when the product they purchased does not provide one."[66]

98. He then went beyond that mere denial to accuse "the plaintiff's bar" of "subscrib[ing] to the idea of never letting a crisis go to waste."[67]

99. He also accused "the plaintiff's bar" of being "unencumbered by what the words in a policy say."[68]

100. In an SEC filing, Defendant Berkley offered a reason why it contends that its policies do not cover COVID-19 business losses. In its most recent quarterly report, it decried "attempts to extend business interruption coverage *where there is no physical damage or loss to proper*ty."[69]

101. Defendant Berkley blatantly misquoted its policies, which do not cover "physical damage or loss to the property." As shown above, they cover "physical *loss of or* damage to property …." Ex. A at 49; Ex. B at 52 (emphasis added). That is a loss that occurs because its insureds' employees have physically lost access to the insureds' property to engage in their normal

---

[65] Edited Transcript of Q1 2020 W.R. Berkley Corp. Earnings Call, April 21, 2020, available on Defendant Berkley's website at https://ir.berkley.com/home/default.aspx (accessed 5/29/2020) ("W.R. Berkley Conference Call").
[66] Conference Call at 4.
[67] *Id.*
[68] *Id.*
[69] W.R. Berkley Corporation, SEC Form 10-Q for Quarterly Period Ended March 31, 2020, at 22.

business activities and customers have lost their physical access to the property to dine in the restaurant.

102. Moreover, despite those denials, Defendant Berkley has set aside $65 million as a "preliminary provision for COVID-19 related losses."[70] In the conference call on April 21, 2020, CEO W.R. Berkley explained that that was the company's best estimate of what it would end up paying for COVID-19 losses:

> [W]e did our best to come up with what an appropriate estimate we thought would be based on the available information at the time. … What I can promise you is, based on the available information at that moment, we did our best to estimate what we think the cost will be for this company. So no, this is not just sort of claims that had come over the transom. It is not that at all. It is our best estimate, understanding the situation and understanding our portfolio, what do we see the costs associated with the circumstance being?[71]

103. In its quarterly SEC report (where it reported that the amount of the reserve was $67 million, not $65 million), the company stated that, "because COVID-19 did not begin to affect the Company's operations and financial position until late in the first quarter of 2020, its impact on the Company's first quarter of 2020 is not necessarily indicative of its potential impact for the remainder of 2020."[72] It also stated that the impact of the pandemic "is expected to include," among other things, additional claims. It stated: "Claim Losses Related to COVID-19 May Exceed Reserves."[73]

104. Nevertheless, even though Defendant Berkley told the investment community that it had preliminarily reserved $65 million or $67 million to cover COVID-19 claims and even that amount might not be sufficient, it has not mentioned those reserves on its web pages directed to

---

[70] https://s22.q4cdn.com/912518152/files/doc_news/W-R-Berkley-Corporation-Reports-First-Quarter-Results-2020.pdf (accessed 5/29/2020) ("2020 1Q 10-Q)|")..
[71] Conference Call at 10.
[72] 2020 1Q 10-Q at 30.
[73] Id.

its customers or acknowledged to them that it expects to pay *any* claims. It wants them to believe their losses and extra expenses won't be covered.

105. An insurance policy is, ultimately, simply a contract where the insured agrees to pay insurance premiums and the insurance company agrees to pay the insured, up to the policy limits, for losses covered by the policy. However, unlike most contracts, the insurer is usually not called upon to perform (since, after all, insurance protects against the unexpected). When the insurer's performance is required, it only arises when the insured is, by definition, in a desperate financial position. Once a loss occurs, an insured can no longer buy protection for that loss from competing insurers – in essence, the insurer has exclusive and complete control over the evaluation, processing and denial of that claim.

106. The implications of this disparity here is clear. Defendants' strategy is to discourage policyholders from making claims in the hope that it will never even have to face their claims, much less pay them.

107. Despite that strategy, Plaintiff made a claim on its policy. Although Plaintiff asked Defendants to respond by June 12, 2020, more than two weeks after Plaintiff first submitted its claim, Plaintiff has not received a response as of the filing of this lawsuit and therefore concludes Defendants have denied it.

## V.  CLASS ALLEGATIONS

108. Plaintiff brings this action on behalf of itself and as a representative of all others who are similarly situated. Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following classes:

> a. All persons and entities owning or operating restaurants and/or eating or drinking establishments in the United States with Business Income (including Extended Business Income) coverage issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a

24

covered loss, or pay for the covered losses (the "National Business Income Coverage Class").

b. All persons and entities owning or operating restaurants and/or eating or drinking establishments in the State of Missouri with Business Income (including Extended Business Income) coverage issued by Defendants and that suffered suspension of business due to COVID-19, and for which Defendants have denied a claim for the losses or have otherwise failed to acknowledge or accept as a covered loss, or pay for the covered losses (the "Missouri Business Income Coverage Subclass").

109. Excluded from each of the above Classes are Defendants, including any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, predecessors, successors, and assigns of Defendants. Also excluded are the judges and court personnel in this case and any members of their immediate families.

110. Plaintiff reserves the right to amend or modify the Class definitions with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

111. This action has been brought and may be properly maintained on behalf of the Classes and Subclasses proposed herein under Rule 23 of the Federal Rules of Civil Procedure.

112. Numerosity. Fed. R. Civ. P. 23(a)(1). The members of each Class and Subclass is so numerous that joinder of all members is impractical. The precise number of Class and Subclass members can be ascertained from Defendants' records.

113. Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to each Class and Subclass, which predominate over any questions affecting individual members of each respective Class. These common questions of law and fact include, without limitation:

    a. Whether Plaintiff and the Class and Subclass members suffered a covered loss under the common policies issued to members of the Class and Subclass;

    b. Whether Defendants wrongfully denied all claims based on COVID-19;

    c.  Whether Defendants' Business Income coverage applies to a suspension of business caused by COVID-19 and/or in response to the presence or threat of COVID-19;

    d.  Whether Defendants' Extra Expense coverage applies to efforts to avoid or minimize a loss caused by COVID-19;

    e.  Whether Defendants have breached their contracts of insurance through a uniform and blanket denial of all claims for business losses related to COVID-19 and/or the related actions of civil authorities taken in response to the presence or threat of COVID-19;

    f.  Whether Plaintiff and the Class and Subclass members suffered damages as a result of Defendants' actions.

114. Typicality. Fed. R. Civ. P. 23 (a)(3). Plaintiff's claims are typical of the claims of the Classes and Subclasses it seeks to represent. Plaintiff and all Class and Subclass members were exposed to uniform practices and sustained injuries arising out of and caused by Defendants' unlawful conduct.

115. Adequacy. Fed. R. Civ. P. 23(a)(4). Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes and Subclasses.

116. Superiority. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual Class and Subclass member's claim is small relative to the complexity of the litigation, and due to the financial resources of Defendants, no Class or Subclass member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, Class and Subclass members will continue to suffer losses and Defendants' misconduct will proceed without remedy. Even if Class and Subclass members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved,

individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard that might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court. Finally, Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

117. Injunctive and Declaratory Relief. Fed. R. Civ. P. 23(b)(2). Defendants' unlawful and unfair conduct is uniform as to all members of each Class. Defendants have acted or refused to act on grounds that apply generally to each Class and Subclass, so that final injunctive relief or declaratory relief is appropriate with respect to each Class and Subclass as a whole.

## VI. JURY DEMAND

118. Plaintiff demands trial by jury on all claims so triable.

### Count I: Business Income Breach of Contract
### (By Plaintiff and the National Business Income Coverage Class)

119. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

120. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants.

121. Plaintiff's policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

122. In the policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded under the policy, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

123. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members lost Business Income and Extended Business Income.

124. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policy and other Class members' policies.

125. Plaintiffs and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

126. Defendants, without justification, have refused performance under the policy and other Class members' policies by denying coverage for these losses. Accordingly, Defendants are in breach of the policy and other Class members' policies.

127. Due to Defendants' breach of the policy and other Class members' policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

### Count II: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income
### (By Plaintiff and the National Business Income Coverage Class)

128. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

129. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants.

130. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Class in the following respects:

   a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

   b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

   c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

   d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

   e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

   f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

   g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

   h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

   i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

   j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

   k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Class; and

   l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

131. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

132. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

## Count III: Declaratory Relief
### (By Plaintiff and the National Business Income Coverage)

133. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

134. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Class against Defendants.

135. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

136. Plaintiff's Policy and the policies of other Business Income Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the policy.

137. In the Policy, Defendants expressly agree to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

138. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

139. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policy and other Class members' policies.

140. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

141. Defendants, without justification, have refused performance under the policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Class members' policies.

142. Plaintiff and the Class members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Class members' losses.

143. An actual case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Class members' policies.

**Count IV: Extra Expense Breach of Contract**
**(By Plaintiff and the National Extra Expense Coverage Class)**

144. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

145. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Class against Defendants.

146. Plaintiff's policy and the policies of other Extra Expense Coverage Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

147. In the Policy, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

148. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Class members to incur extra expenses.

149. The extra expenses triggered the Extra Expense Coverage under the policy and other Class members' policies.

150. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

151. Defendants, without justification, have refused performance under the policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Class members' policies.

152. Due to Defendants' breach of the policy and other Class member policies, Plaintiff and other Class members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

### Count V: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By Plaintiff and the National Extra Expense Coverage Class)

153. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

154. Plaintiff brings this claim individually and on behalf of the Extra Expense Class against Defendants.

155. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Class with respect to the Extra Expense provisions in the following respects:

    a. Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Class the benefits of their policies;

    b. Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Class of the benefits of their policies;

    c. Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Class' claims;

32

d. Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Class' policies;

e. Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

f. Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Class' claims;

g. Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Class' losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Class as they give to their own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Class; and

l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

156. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

157. As a result of this breach, Plaintiff and the Class have been damaged in an amount to be proven at trial.

**Count VI: Declaratory Relief**
**(By Plaintiff and the National Extra Expense Class)**

158. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

159. Plaintiffs bring this claim individually and on behalf of the Extra Expense Class against Defendants.

160. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

161. Plaintiff's policy and the policies of other Extra Expense Class members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Class members' losses for claims covered by the Policy.

162. In the Policy, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Class members' premises, to repair or replace any property, and other expenses.

163. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

164. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff's and Class members losses.

165. The extra expenses triggered the Extra Expense Coverage under the policy and other Class members' policies.

166. Plaintiff and the other Class members have complied with all applicable provisions of their respective policies, including payment of premiums.

167. Defendants, without justification, have refused performance under the policy and other Class members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Class members' policies.

168. Plaintiff and the Class members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Class members' losses.

169. An actual case or controversy exists regarding Class members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's policy and other Class members' policies.

### Count VII: Business Income Breach of Contract
### (By Plaintiff and the Missouri Business Income Coverage Subclass)

170. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

171. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Subclass against Defendants.

172. Plaintiff's policy and the policies of other Business Income Coverage Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Subclass members' losses for claims covered by the Policy.

173. In the policy, Defendants expressly agree to pay for losses of Business Income incurred as a result of causes not excluded under the policy, including losses caused by the COVID-19 pandemic. Specifically, Defendants promise to pay for losses of Business Income (including Extended Business Income) sustained as a result of a business suspension.

174. A covered loss has resulted in business suspensions, which have caused Plaintiff and Subclass members lost Business Income and Extended Business Income.

175. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policy and other Subclass members' policies.

176. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

177. Defendants, without justification, have refused performance under the policy and other Subclass members' policies by denying coverage for these losses. Accordingly, Defendants are in breach of the policy and other Subclass members' policies.

178. Due to Defendants' breach of the policy and other Subclass members' policies, Plaintiff and other Subclass members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

**Count VIII: Breach of the Implied Covenant Of Good Faith And Fair Dealing Applicable to Business Income**
**(By Plaintiff and the Missouri Business Income Coverage Subclass)**

179. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

180. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Subclass against Defendants.

181. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Business Income Coverage Subclass in the following respects:

    a.   Unreasonably acting or failing to act in a manner that deprives Plaintiff and the Subclass of the benefits of their policies;

    b.   Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Subclass of the benefits of their policies;

    c.   Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Subclass' claims;

    d.   Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Subclass' policies;

    e.   Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

    f.   Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

    g.   Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Subclass' losses;

    h.   Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

    i.   Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Subclass as they give to their own interests;

    j.   Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

    k.   Unreasonably placing their own financial interests above the interests of Plaintiff and the Subclass; and

    l.   Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

182. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing.

183. As a result of this breach, Plaintiff and the Subclass have been damaged in an amount to be proven at trial.

### Count IX: Declaratory Relief
### (By Plaintiff and the Missouri Business Income Coverage Subclass)

184. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

185. Plaintiff brings this claim individually and on behalf of the Business Income Coverage Subclass against Defendants.

186. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

187. Plaintiff's Policy and the policies of other Business Income Coverage Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Subclass members' losses for claims covered by the policy.

188. In the Policy, Defendants expressly agree to pay for loss of Business Income and Extended Business Income incurred as a result of the causes not excluded under the policy. Specifically, Defendants promised to pay for losses of business income sustained as a result of a business suspension.

189. A covered loss has resulted in business suspensions, which have caused Plaintiff and Subclass members losses.

190. The business suspensions and losses triggered the Business Income and Extended Business Income coverage under the policy and other Subclass members' policies.

191. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

192. Defendants, without justification, have refused performance under the policy and other Subclass members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Subclass members' policies.

193. Plaintiff and the Subclass members seek a judicial determination of whether the policies provide coverage for Plaintiff's and Subclass members' losses.

194. An actual case or controversy exists regarding Subclass members' rights and Defendants' obligations under the terms of the Subclass members' policies.

## Count X: Extra Expense Breach of Contract
### (By Plaintiff and the Missouri Extra Expense Coverage Subclass)

195. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

196. Plaintiff brings this claim individually and on behalf of the Extra Expense Coverage Subclass against Defendants.

197. Plaintiff's policy and the policies of other Extra Expense Coverage Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Subclass members' losses for claims covered by the Policy.

198. In the Policy, Defendants expressly agree to pay for extra expenses incurred as a result of the causes not excluded under the policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue 'operations' at Plaintiff's and Subclass members' premises, to repair or replace any property, and other expenses.

199. A covered loss has resulted in a business suspension. These suspensions have caused Plaintiff and Subclass members to incur extra expenses.

200. The extra expenses triggered the extra expense coverage under the policy and other Subclass members' policies.

201. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

202. Defendants, without justification, have refused performance under the policy and other Subclass members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Subclass members' policies.

203. Due to Defendants' breach of the policy and other Subclass member policies, Plaintiff and other Subclass members have suffered actual and substantial damages for which Defendants are liable, in an amount to be proved at trial.

### Count XI: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By Plaintiff and the Missouri Extra Expense Coverage Subclass)

204. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

205. Plaintiff brings this claim individually and on behalf of the Extra Expense Subclass against Defendants.

206. Defendants have breached the duty of good faith and fair dealing owed to Plaintiff and the Extra Expense Subclass with respect to the Extra Expense provisions in the following respects:

    a.  Acting or failing to act in a manner that deprives Plaintiff and the Subclass the benefits of their policies;

    b.  Unreasonably engaging in a pattern and practice of acting or failing to act in a manner that deprives Plaintiff and the Subclass of the benefits of their policies;

    c.  Unreasonably failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of Plaintiff's and the Subclass' claims;

    d.  Unreasonably engaging in a pattern and practice of failing to conduct a prompt, fair, balanced and thorough investigation of all of the bases of claims made under Plaintiff's and the Subclass' policies;

    e.  Unreasonably failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

    f.  Unreasonably engaging in a pattern and practice of failing to diligently search for and consider evidence that supports coverage of Plaintiff's and the Subclass' claims;

    g.  Unreasonably failing to conduct an investigation to determine the efficient proximate cause (predominant cause) of Plaintiff's and the Subclass' losses;

h. Unreasonably engaging in a pattern and practice of failing to conduct an investigation to determine the efficient proximate cause (predominant cause) on claims made by insureds;

i. Unreasonably failing to give at least as much consideration to the interests of Plaintiff and the Subclass as they give to their own interests;

j. Unreasonably engaging in a pattern and practice of failing to give at least as much consideration to the interests of their insureds as they give to their own interests;

k. Unreasonably placing their own financial interests above the interests of Plaintiff and the Subclass; and

l. Unreasonably engaging in a pattern and practice of placing their own financial interests above the interests of their insureds.

207. By acting in the aforementioned way, Defendants breached the implied covenant of good faith and fair dealing with respect to the Extra Expense provisions of the policies.

208. As a result of this breach, Plaintiff and the Subclass have been damaged in an amount to be proven at trial.

**Count XII: Declaratory Relief**
**(By Plaintiff and the Missouri Extra Expense Subclass)**

209. Plaintiff realleges and incorporates by reference the allegations contained in all prior paragraphs of this Complaint, as though fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

210. Plaintiff brings this claim individually and on behalf of the Extra Expense Subclass against Defendants.

211. This Court has jurisdiction to declare the rights and other legal relations pursuant to 28 U.S.C. §§ 2201-2202.

212. Plaintiff's policy and the policies of other Extra Expense Subclass members are insurance contracts under which Defendants were paid premiums in exchange for promises to pay Subclass members' losses for claims covered by the Policy.

213. In the Policy, Defendants expressly agree to pay extra expenses incurred as a result of the causes not excluded under the Policy. Specifically, Defendants promise to pay amounts to avoid or minimize the losses from suspension of business and to continue "operations" at Plaintiff's and Subclass members' premises, to repair or replace any property, and other expenses.

214. A covered loss has resulted in business suspensions, which have caused Plaintiff and Class members losses.

215. These covered losses have resulted, and will result, in extra expenses, which have caused Plaintiff and Subclass members losses.

216. The extra expenses triggered the Extra Expense Coverage under the policy and other Subclass members' policies.

217. Plaintiff and the other Subclass members have complied with all applicable provisions of their respective policies, including payment of premiums.

218. Defendants, without justification, have refused performance under the policy and other Subclass members' policies by denying coverage for these losses and expenses. Accordingly, Defendants are in breach of the policy and other Subclass members' policies.

219. Plaintiff and the Subclass members seek a judicial determination of whether the Extra Expense provisions of the policies provide coverage for Plaintiff's and Subclass members' losses.

220. An actual case or controversy exists regarding Subclass members' rights and Defendants' obligations under the terms of the Extra Expense provisions of Plaintiff's policy and other Subclass members' policies.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that the Court enter judgment against Defendants, as follows:

42

1.   An order certifying appropriate classes and/or subclasses, designating Plaintiff as the class representative and its counsel as class counsel;

2.   A judicial declaration declaring the meaning of the provisions concerning the business income coverage and extra expense coverage;

3.   An award of damages to Plaintiff and the Class in an amount to be determined at trial;

4.   An order requiring Defendants to pay both pre- and post-judgment interest on any amounts awarded, as allowed by law;

5.   An award of costs and attorneys' fees, as allowed by law; and

6. Such other or further relief as may be appropriate.

Dated: June 12, 2020                    Respectfully submitted,

                                        **LAW OFFICE OF RICHARD S. CORNFELD, LLC**


                                        By:   */s/ Richard S. Cornfeld*
                                              Richard S. Cornfeld, #31046MO
                                              Daniel S. Levy, #66039MO
                                              1010 Market Street, Suite 1645
                                              St. Louis, Missouri 63101
                                              P. 314-241-5799
                                              F. 314-241-5788
                                              rcornfeld@cornfeldlegal.com
                                              dlevy@cornfeldlegal.com

                                              And

                                              Anthony S. Bruning, #30906MO
                                              Anthony S. Bruning, Jr., #60200MO
                                              Ryan L. Bruning, #62773MO
                                              THE BRUNING LAW FIRM, LLC
                                              555 Washington Avenue, Suite 600
                                              St. Louis, Missouri 63101
                                              P. 314-735-8100 / F. 314-898-3078
                                              tony@bruninglegal.com
                                              aj@bruninglegal.com
                                              ryan@bruninglegal.com

And

Alfredo Torrijos (*Pro Hac Vice* to be submitted)
ARIAS SANGUINETTI WANG & TORRIJOS,
LLP
6701 Center Drive West, 14th Floor
Los Angeles, CA
T: (310) 844-9696
F: (310) 861-0168
alfredo@aswtlawyers.com

***Attorneys for Plaintiff***

44